1 DAVID W. RIZK - CABN # 284376
2261 Market Street, Suite 5947
2 San Francisco, CA 94114
Telephone: (415) 517-9044
3 Email: david@dwr-firm.com

5 Counsel for Defendant LOPEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 23-0360 JD |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE** |
| v. | |
| JOSHUA LOPEZ, | |
| Defendant. | |

## I.  INTRODUCTION

Defendant Joshua Lopez will be before the Court for sentencing in this drug case. As of sentencing he will have served almost ten months in custody. Never having received a sentence of longer than one day, Mr. Lopez now respectfully requests a sentence of 20 months in recognition of (1) the seriousness of the offense, (2) the fact that prior one-day sentences and arrests did not deter him from distributing drugs, and (3) the near-certainty that he will be deported from the Bureau of Prisons (BOP) and thus separated from his partner and infant daughter.

Mr. Lopez immigrated alone to the United States when he 20 years old. He came to this country looking for economic opportunity and a way to support his family, following the loss of his father to leukemia. Mr. Lopez entered through Arizona and came to the Bay Area to find work in construction, however, he was unable to make ends meet. He slept on the floor in someone else's apartment and could barely afford to pay for food and contribute to rent. Although Mr. Lopez was

desperate, he did not seek out the drug business as some young immigrants do; instead, he was randomly recruited by a man while riding on BART. Now, Mr. Lopez has satisfied the safety valve requirements and done everything in his power to assist the government in remediating the harm from his conduct. He is genuinely remorseful.

A 20-month sentence in a U.S. prison followed by deportation is a severe sanction for a 24-year old who has never been sentenced to more than a day in jail previously. A sentence of nearly four years—proposed by the government and U.S. Probation—would be greater than necessary, especially given that Mr. Lopez will be deported from the federal prison system.

## II. BACKGROUND

Mr. Lopez was raised in a rural, agrarian community in Honduras about an hour outside the capital of Tegucigalpa. His father worked in the fields and his mother took care of Mr. Lopez and his seven siblings. PSR ¶ 45. Mr. Lopez's childhood was challenging. The family was poor and living conditions were difficult. *Id.* ¶¶ 46, 51. When asked by the probation officer if he participated in afterschool sports or like activities, for example, Mr. Lopez explained that there were no opportunities for fun during his childhood; he was either at school, or doing schoolwork, or working.

Mr. Lopez's father, Dagoberto, passed away when Mr. Lopez was 15 years old, a formative moment in his life. *Id.* ¶ 47. Mr. Lopez was the youngest child and he had a particularly close relationship with his dad. He recalls his father was very attentive to his children and kind; he made a point of walking to pick up his children from school. On December 29, 2014, he fell sick and went to the hospital. He was diagnosed with leukemia and remained at the hospital for treatment. Mr. Lopez explains that the hospitals in Honduras are overcrowded and unclean; therefore, for his own protection, he was only permitted to visit his father once while he was in the hospital. He recalls being removed from school by a cousin, who would not say whether something had happened to his father, and then learning the news that his father had died at home, where everyone was crying. The loss was particularly difficult for his mother, who suffered from depression.[1] They had been married 40 years. Mr. Lopez's family could not afford any grief counseling, of course. *Id.* ¶ 47.

---

[1] Lost in translation, the PSR incorrectly refers to his mother's "high blood pressure," rather than depression. PSR ¶ 46.

Everything changed after the loss of Dagoberto. Mr. Lopez, like all of his siblings, had to begin working, and he could only earn a few dollars a day. *Id.* ¶ 46. The electricity would be cut off from time to time and his mother could not afford her medication. *Id.* Mr. Lopez recalls that there was just enough food in the house, but they could not afford new clothes or shoes. Years later, when Mr. Lopez was in the United States, he marveled at everyone's relative wealth—he noticed most people wore clean clothes all the time, new shoes, and seemed to have

Like many of the young Honduran defendants before the Court, Mr. Lopez came to the United States when he was 20 years old under the mistaken impression that doing so would allow him to earn a living wage and share some of his savings with his mother and his family in Honduras. That turned out to be wrong. When he first arrived, he had nothing: no money, no belongings, not even a change of clothes. Mr. Lopez was able to find legitimate work in construction with the help of a family member when he first arrived, but he could not afford to provide for himself let alone support a family. *Id.* ¶ 49. The financial hardship increased when he had a daughter with his partner.

Mr. Lopez was randomly approached by a man on a BART train who suggested he could make some money by selling drugs. He was introduced to a man who loaned him drugs for sale and showed him how and where he could sell on a street corner. Mr. Lopez worked for this man and sent him money roughly monthly. Even after he was arrested, he honestly told law enforcement that he felt trapped by his financial obligations. *Id.* ¶ 35. ("During a mirandized interview with law enforcement, Lopez reported he resided in Oakland and had resided in California for four years. He indicated he had been arrested for drug sales in San Francisco approximately five times. He told law enforcement he sold drugs because he was in a bad financial situation and was about to be evicted, and to support his daughter."). To the probation officer, he similarly commented: "Once you have a family and you have to pay rent and you can't pay it, it is hard. It doesn't justify what I did, I know it was wrong."

Mr. Lopez was arrested on October 2, 2023, and will have served nearly ten months in custody by the time of sentencing on July 22, 2024. As the PSR reflects, the longest sentence he previously received was one day. *Id.* ¶¶ 26-27.

### III. PRESENTENCE REPORT & GUIDELINES CALCULATION

The defense has no unresolved objections to the PSR.

## IV.     ARGUMENT

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of § 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the guidelines not mandatory, "they are also not to be presumed reasonable." *Nelson v. Arizona*, 555 U.S. 350, 352 (2009) (emphasis added); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Several matters warrant the Court's consideration in connection with the § 3553(a) factors and Mr. Lopez's request for a sentence 20 months followed by three years of supervised release:

*First*, as to the circumstances of the offense and Mr. Lopez's personal history, a sentence of 20 months is an appropriate sanction. Mr. Lopez's offense is more significant than some hand-to-hand drug sales cases that come before the Court, but it was also far from the most serious. The government did not see fit to file mandatory minimum charges in this matter, and there were no threats or weapons involved. Although Mr. Lopez has been arrested and plead guilty to accessory twice previously (once as a misdemeanor, once as a felony), he was sentenced to just one day in jail each of those cases. Mr. Lopez has considerably *less* than criminal history than some defendants included in the government's Fast Track program. *See, e.g.*, *United States v. Hernandez-Cruz*, 23-

CR-315 EMC (Criminal History Category III), *United States v. Arteaga-Colindres*, 23-CR-400 SI (Criminal History Category IV), *United States v. Salas-Lozano*, 23-CR-101 RFL (Criminal History Category III). Undersigned counsel understands the Court's view that Mr. Lopez was "the last mile" that enabled drug distribution, and therefore no less culpable than others in the drug business. However, Mr. Lopez was, like most defendants prosecuted by the federal government, still just a street-level dealer.[2] He was not an organizer or a leader of any drug trafficking organization. He was not a supplier, the drugs and the profits did not belong to him personally, and ultimately, he did not get rich. His offense was motivated by financial desperation, borne out of poverty in Honduras and, originally, a family tragedy.

Mr. Lopez's current, personal circumstances further suggest that a longer sentence is unwarranted and would be overly harsh. Although Mr. Lopez indicted to U.S. Probation that he hopes his partner, Sayra, and their two-year-old daughter will join him in Honduras, their relationship is strained because of his incarceration. *Id.* ¶ 48 ("He indicated his incarceration has strained their relationship and he has had minimal contact with her, but she remains supportive of him."). Regardless, of what happens, Mr. Lopez understands he will be returned to Honduras, where he intends to remain. *Id.* ¶ 50 ("He would like to return to Honduras to be with his mother as she is ill."). Complicating matters, their two-year old daughter (a U.S. citizen) is now in foster care because Sayra is reportedly in custody, according to a family member. *Id.* ¶ 50. There is thus a distinct possibility that Mr. Lopez's sentence and deportation will permanently separate him from his daughter and Sayra, should they elect to remain in the United States. At a minimum, Mr. Lopez will be separated from his daughter for an extended and critical period of her early childhood—an extremely harsh punishment for both father and daughter.

*Second,* just punishment, deterrence, and public safety considerations, do not warrant a longer custodial sentence than 20 months. In terms of just punishment, given that Mr. Lopez has never served any substantial sentence in custody prior to this case, a 20-month sentence here would

---

[2] *See* U.S. Sentencing Commission, *Fentanyl and Fentanyl Analogues: Federal Trends and Trafficking Patterns* (Jan. 2021), at 28, Fig. 17 (showing 39.6% of defendants prosecuted are street level dealers) *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210125_Fentanyl-Report.pdf (last accessed July 8, 2024).

DEFENDANT'S SENTENCING MEMORANDUM
*LOPEZ*, CR 23–0360 JD

5

constitute greatly escalated punishment for him, given his personal record. And, for a relatively young person, it would comprise nearly 10 percent of Mr. Lopez's entire lifetime. It is also, of course, a far cry from the time-served sentences that some defendants are receiving as part of the government's Fast Track program. Thus, by any measure, 20 months is a substantial sanction. Adding two more years of custody time, in order to arrive at the roughly 4-year sentence proposed by the government and probation, will not advance the purposes of the sentencing statute.

In particular, such a lengthy sentence will not meaningfully promote public safety. The threat that Mr. Lopez previously presented to public safety has been neutralized already. There is no realistic chance he will step foot in the Bay Area again, or for that matter, ever handle narcotics again. Thus, in terms of incapacitating Mr. Lopez, that has already been accomplished. *Any* substantial prison sentence, especially given the near certainty of deportation directly from BOP thereafter, effectively accomplishes the same intervention—incapacitation and then removal from the community. Incarcerating Mr. Lopez for another two years and $100,000 of taxpayer funds is simply a waste of time and resources.[3]

As for specific and general deterrence, this prosecution has already dramatically undermined any financial incentive to sell drugs that Mr. Lopez or similar offenders might perceive. Mr. Lopez himself is now indigent, he cannot afford to pay a fine, he has no belongings or property, and the probation office could not even conduct a home investigation because he no longer has any residence and is likely to be deported. PSR ¶ 44. His family has been separated and is destitute, as a direct result of his incarceration. A sentence of 20 months thus sends a message to the community that being federally prosecuted for selling drugs as Mr. Lopez did is disastrous, not profitable. A longer sentence is not necessary. *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary….").

Virtually all of the young Hondurans here working in the drug business fled their community at home, mostly due to drastic poverty and minimal opportunities. Deporting these young men to their home country sends a significant message to the community that traveling to the United States to

---

[3] The cost of housing a defendant in federal custody is approximately $49,770 per year, according to the PSR. *Id.* ¶ 71.

DEFENDANT'S SENTENCING MEMORANDUM
*LOPEZ*, CR 23–0360 JD

6

look for whatever work may be available, even if it is selling drugs, is not a viable option. Deterrence in this situation is best delivered via a reasonable sentence, followed by immediate removal. Moreover, even to the extent that a longer custodial sentence might seem to the Court to promise greater deterrent effect, the most recent evidence from the Sentencing Commission reveals that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[4] Accordingly, there is no empirical basis to believe that a 46-month sentence, as opposed to a 20-months sentence, will realize any benefit.

*Third*, as to educational, vocational, medical, or other correctional treatment, Mr. Lopez is unlikely to benefit from any programming in prison and will almost certainly never receive any supervision in the United States such that the Court could provide meaningful services.

*Fourth*, and finally, the defense objects to imposition of a suspicionless search clause. The Ninth Circuit warns in the very case relied upon by the government that "warrantless, suspicionless search conditions of this sort should not be routinely imposed." *United States v. Cervantes*, 859 F.3d 1175, 1184 (9th Cir. 2017). Notably, the defendant in *Cervantes* was also on mandatory supervision, a form of conditional release in the state system that is similar to parole, where the state has a greater interest in supervision and the defendant has a lesser privacy interest.

Notably, although Mr. Lopez is unlikely to find himself on federal supervision given that he will likely be removed, he retains the right to appeal the imposition of a sentence (including a supervision condition) that violates his constitutional rights where the underlying right was not expressly and specifically waived in a valid plea agreement. *See United States v. Wells*, 29 F.4th 580, 587 (9th Cir. 2022). Mr. Lopez's plea agreement does not waive his Fourth Amendment rights, and thus he is free to appeal. Thus, by imposing the condition, the Court will almost certainly guarantee that this case continues to generate substantial litigation and expend government and court resources.

---

[4] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Mar. 21, 2024).

DEFENDANT'S SENTENCING MEMORANDUM
*LOPEZ*, CR 23–0360 JD

On the merits, the government is very likely to lose an appeal. Imposition of a suspicionless search clause must be reasonably related to deterrence, protection of the public, and/or rehabilitation. *United States v. LaCoste*, 821 F.3d 1187, 1190-91 (9th Cir. 2016) (citing 18 U.S.C. §§ 3583(d)(1), 3553(a)(1), (a)(2)(B)-(D); *United States v. Rearden*, 349 F.3d 608, 618 (9th Cir. 2003)). In addition, "the condition must be consistent with the Sentencing Commission's policy statements." *Id.* at 1191 (citing 18 U.S.C. § 3583(d)(3)). "And finally, the condition may involve 'no greater deprivation of liberty than is reasonably necessary' to serve the goals of supervised release." *Id.* (citing § 3583(d)(2), and *United States v. Riley*, 576 F.3d 1046, 1048 (9th Cir. 2009)).

As an initial matter, the standard search condition is enough to satisfy the purposes of §§ 3553(a)(1), (a)(2)(B)-(D) in this case. There is nothing particularly remarkable or unusual about Mr. Lopez's case that would justify a more restrictive search condition. Mr. Lopez was stopped for a Vehicle Code violation, officers observed—in plain view—a backpack apparently covered in white powder covering it and a machete, and he fled when the backpack was searched. An ordinary search condition would not be necessary to ferret out the instant offense; indeed, no search condition was required. Thus, to state the obvious, a suspicionless search clause also would have had no impact on law enforcement's investigation in this case. His offense was not concealed in some way that renders investigation difficult; rather, it was overt. His prior convictions are of a very similar nature. Thus, to impose the condition here would violate the Circuit's recent warning that such an intrusive condition should not be "routinely imposed."

Unlike other cases where the Circuit has allowed such a search condition, Mr. Lopez's offense also was not sophisticated or complex. *See, e.g., United States v. Betts*, 511 F.3d 872, 874 (9th Cir. 2007) (defendant was the "inside man" at TransUnion who accepted bribes to place fake letters in TransUnion's internal databases to falsify 654 credit histories, generating approximately a $1 million in losses to lenders who made bad loans). The government argues that the defendant in *Cervantes* "had a similar record of recidivism and supervised release violations" to Mr. Lopez. *See* ECF No. 38 at 7. That is not accurate. The defendant in that case does not come close to resembling Mr. Lopez's profile. That defendant was "convicted in 16 separate cases over a 14-year time span, mostly for offenses related to drugs or counterfeiting." *See* 859 F.3d at 1184. He also had a "lengthy history of

violating the conditions of previously imposed terms of supervision—at least 18 prior violations in all." *Id.* Mr. Cervantes had also committed the instant offense while on a suspicionless search condition. *Id.* By contrast, Mr. Lopez has been convicted of *one* prior non-violent felony and *one* misdemeanor over four years, all while in his teens and early twenties. *See* PSR ¶¶ 26-27. He has *one* prior state probation violation that resulted in a revocation. PSR ¶ 27. *Cervantes* thus certainly does not stand for the proposition that a defendant in a routine drug case, with one prior felony, one prior misdemeanor, and one prior probation revocation, is amenable to a suspicionless search clause. *See* 859 F.3d at 1184.

The Sentencing Commission's Policy Statements also do not support imposition of a special suspicionless search condition. *See* U.S.S.G. § 5D1.3 (Conditions of Supervised Release). The condition is not among the many special conditions adopted by the Sentencing Commission, and the government's supplemental brief cites nothing from the Commission's Policy Statements to support the imposition of a condition of supervised release that, again, the Ninth Circuit has explicitly said should not be routinely imposed.

Finally, imposing the condition would violate the legal requirement that conditions of supervised release must involve "no greater deprivation of liberty than is reasonably necessary" to serve the goals of supervised release. 18 U.S.C. § 3583(d)(2). The government makes no effort to explain why a suspicionless search condition, rather than a standard condition, is reasonably necessary here. The absence of evidence in the record to suggest that a suspicionless search condition is necessary to ensure public safety or deter Mr. Lopez, given the actual circumstances of this offense and his relatively limited criminal record (at least compared to *Cervantes*), indicates that the standard search condition is appropriate and sufficient here.

V. **CONCLUSION**

For all the reasons set forth above, Mr. Lopez respectfully asks the Court to sentence him to 20 months, followed by three years of supervised release.

//

//

//

Dated: July 8, 2024					Respectfully submitted,

					/S
					DAVID W. RIZK
					Counsel to Mr. Lopez